# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TEJAN BAH** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | 23-cv-01248-JDB |
| | ) | |
| **THE DISTRICT OF COLUMBIA, et al.,** | ) | |
| | ) | |
| *Defendants.* | ) | |

## FIRST AMENDED COMPLAINT

1. This is a civil action seeking compensatory damages for injuries suffered by Mr. Tejan Bah. While in the custody of the DC Department of Corrections, he was attacked by other prisoners and stabbed in the eye. His sight is unlikely to ever recover.

2. This action arises under the Fifth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983 and the common law of the District of Columbia.

### I. Jurisdiction

3. This court has jurisdiction over this action under 28 USC § 1331.

4. Notice was provided to the Mayor of the District of Columbia within six months, giving details of the date, time, place and circumstances of the attack on plaintiff, as required by D.C. Code §12-309.

## II. Parties

5.  Plaintiff, Mr. Tejan Bah, is an adult natural person who, at all times relevant to this action, was a pretrial detainee in the District of Columbia Department of Corrections. He has since been released from custody.

6.  Defendant District of Columbia is a municipal corporation. It has, and at all relevant times to this action had, responsibility for people incarcerated under its authority. It exercises control over such people through its Department of Corrections. The Department of Corrections uses the Correctional Treatment Facility ("DC JAIL") for the housing incarcerated persons who are being held pretrial or who are serving short term sentences. It is charged by D.C. Code §24-211.02 (2018 Edition) with responsibility for the safekeeping, care, protection, instruction and discipline of all persons committed to its penal institutions.

7.  Defendants, John Does are presently unknown correctional officers employed by the D.C. Department of Corrections.

## III. Facts

### A. The Attack on Mr. Bah.

8.  On November 12, 2022, in the afternoon, in Housing Unit NW2, Mr. Bah got in an argument with another inmate who wanted to cut the line to use the phone on the cell block. No guard had sight and sound supervision over the phone lines, as the national standard of care requires. Sight and sound supervision would have led staff of the Jail to know that extra care was needed to control this inmate.

9. Moreover, this other inmate was particularly dangerous. He has previously stabbed at least two other jail residents — showing that he was violent and knew how to get contraband weapons. Jail employees should have used extra caution.

10. Unfortunately for Mr. Bah, they did not.

11. Later that day, at about 5.15 pm, the other inmate came up to Mr. Bah in the bathroom, where inmates were left completely unsupervised, in violation of the national standard of care for jail supervision.

12. The other inmate had a metal knife, which under all circumstances is contraband that should not be present in the Jail.

13. In the unsupervised space, this other inmate repeatedly stabbed Mr. Bah.

14. Mr. Bah received wounds in his lower back, his abdomen and in his right eyeball.

15. He underwent emergency surgery on his right eye at Washington Hospital Center.

16. Mr. Bah's vision from his right eye has been severely impaired as a result, and it is not clear that he will ever get his full sight back.

### B. DOC Policies, Practices, and Unheeded Warnings Led to the Attack

#### (1). The Jail Has Been Pervasively Understaffed

17. The DC Jail—like all jails—houses people who have been accused or convicted of numerous law violations, including violent crimes.

18. The DC Jail—like all jails—houses a significant number of people with mental health disabilities.

19. Because this creates a volatile mix, national standards require that jail staff maintain sight and sound supervision of all prisoners.

20. Yet, the DC Jail does not meet that standard.

21. Part of the reason the Jail does not meet that standard is that the DOC is "chronically understaffed."[1]

22. There are not enough officers to provide effective supervision and ensure the safety of all the prisoners.

### (2). In 2021, The Marshals Find the DC Jail Full of "Systematic Failures."

23. The District has had many warning of the impact of lack of staffing and other failures in the DOC.

24. In November 2021, the United States Marshals Service removed 400 people in its custody from the DC Jail after an unannounced inspection.

25. In a memorandum the Marshals conveyed the following observations.

26. Entrance screening procedures—the first-line check against introduction of contraband—were "inconsistent and sloppy." This should have alerted the District that contraband was a significant danger.

27. The Jail was full of the "strong smoke and odor of marijuana," which provides indications of the introduction of contraband, the failure of staff to address known contraband, and the failure of supervisory staff to address those failures.

---

[1] Report of the Committee on Facilities & Services to the District Task Force on Jails & Justice, 6 (Aug. 19, 2019), http://www.courtexcellence.org/uploads/publications/FacilitiesServices.pdf. See also *Banks v. Booth*, 518 F. Supp. 3d 57, 66 (D.D.C. 2021) (discussing staffing shortages impact on the failure to implement COVID prevention measures).

28. Prisoners had observable injuries with no corresponding medical or incident reports, which should have indicated to the District that Jail staff were not properly observing, preventing, or addressing injuries suffered by the people held in the jail.

29. In the presence of the inspecting U.S. Marshals, DOC staff were openly antagonizing inmates. This finding should have alerted the District that staff were improperly trained to understand that they are responsible for the safety and wellbeing of those people confined to DOC custody.

30. In the presence of the inspecting U.S. Marshals, DOC staff were openly telling prisoners not to cooperate with the inspectors. This finding should have alerted the District that staff were improperly trained to understand that they should not impede the operation of other law enforcement agencies making sure that the DOC operates according to the law.

31. "Supervisors appeared unaware or uninterested in any of these issues." That finding should have should have alerted the District that supervisory staff were completely falling down on the job.

32. This unprecedented memorandum and removal of 400 USMS prisoners from the Jail should have been treated as indication of a four-alarm emergency regarding conditions in the DC Jail. The District failed to respond appropriately.. As confirmed to the Washington Post, there were no significant changes or staff discipline in the wake of the report.[2]

### (3). Warnings from the DC Office of the Inspector General

---

[2] Emily Davies, City officials dispute reports of 'egregious' conditions at D.C. jail, The Washington Post (Dec. 7, 2021) https://www.washingtonpost.com/dc-md-va/2021/12/07/dc-jail-conditions-tour/

33. The District of Columbia and the Department of Corrections have had further notices of severe security lapses.

34. A July 2021 audit report conducted by the DC Office of the Inspector General ("DC OIG") identified nine areas of deficiencies in DOC's operating procedures related to use of force incidents and incidents involving resident safety. Each of these deficient policies and procedures allow dangerous, preventable attacks to occur, like the one experienced by Mr. Bah.

35. For example, The DC OIG's report found that DOC had multiple lapses in security practices that resulted in use of force to regain control of residents, including where a control module officer opened and closed cell doors while the floor unit officers were not on the floor, thus allowing residents to exit their cells without proper supervision.[3]

36. While this audit focused on uses of force by staff, security lapses lead to all manner of risk to residents and staff at the Jail.

37. Further, the audit report revealed that 15% of the surveillance cameras in DOC did not work at all or did not work correctly, and DOC had not allocated funding to surveillance equipment repairs or upgrades since 2016.[4] These security cameras are intended to "provide real-time monitoring and response to incidents and activities" in DOC facilities, including monitoring "individuals/groups who may pose a unique and significant threat to the safety of … inmates within the DC DOC."[5]

---

[3] DOC's Current Procedures for Receiving, Investigating, and Resolving Use of Force Incidents Are Not Operating Effectively, District of Columbia Office of the Inspector General, OIG Project No. 20-1-26FL at 8 (July 2021).

[4] *Id.* at 10.

[5] *Id.* at 9.

38. When security cameras do not work, the problems created by lack of staff are exacerbated. In Mr. Bah's situation, either no staff member noticed a man first secreting a knife and then taking it to the bathroom, or a staff member noticed and did not respond.

### (4). The Levels of Historical Violence in the DOC Provided Other Unheeded Warnings

39. DC Jail and the Correctional Treatment Facility ("CTF") have for years had excessively high levels of contraband weapons in circulation, up until the attack on plaintiff.

40. These following incidents illustrate the problem.

41. On May 6, 2008, Mr. Pierre Lewis, an inmate at the D.C. Jail, was attacked by other inmates, with a knife or knives, and sustained serious stab wounds to the chest, arm, shoulder and back. At the time of the attack, Mr. Lewis was housed in Housing Unit North 2, a protective custody unit. As a protective custody unit North 2 had restrictive rules in place for recreation periods, when men were allowed out of their cells, who was allowed communal recreations and who had to be given recreation in isolation. On the evening of the attack inmates began to "pop" or open their locked cell doors and make their way out of their cells, which led to an almost complete breakdown of security on the unit. The problem with malfunctioning cell door locks was well known to the staff at D.C. Jail. Because of this, Lt. Danny Hunter had ordered Cpl Okegbu to check manually all the doors. Yet this order was ignored.

42. On January 5, 2009, Mr. Arsenio Cleckley, an inmate at D.C. Jail was attacked by another inmate in housing unit Northeast 1, while sleeping inside his cell. The assailant was not housed in Mr. Cleckley's cell. Mr. Cleckley was stabbed several times and

received serious wounds to his hand and arm. The Post Orders for the unit stated: "Cell doors shall remain closed at all times. During out of cell time, all doors shall remain closed and be opened once every hour for inmate needs. Cell doors shall not be opened the group setting. To prevent theft, assaults, and authorized cell entry, the assigned officers shall ensure that a cell door is only opened for the inmate assigned to that cell." The unit was understaffed at the time of the incident and this Order was ignored. The attack was unseen by correctional officers on duty

43. On May 19, 2009 at D.C. Jail, on housing unit Southeast 1, Mr. Allen Randolph was stabbed eleven times in the back, left shoulder and left arm, while inside his cell, by four other inmates who were not residents of that cell. The attack was not seen or heard by correctional officers. Again, the door to Mr. Randolph's cell had been left unlocked while he was inside in violation of the unit's own Post Orders and the national standard of care.

44. On July 1, 2010, while Mr. Willie Parker was sitting in his cell, the door of which was open when three inmates entered and stabbed Mr. Parker with a metal knife. Again, the Post Orders for the unit required that cell doors remain closed at all times unless inmates are entering or leaving the cell were ignored. The unit was understaffed at the time of the incident and the attack was not seen by correctional officers.

45. On January 7, 2011 at D.C. Jail, Mr. Elias McRae, an inmate of D.C. Jail, who was being held under the name of Pete McCrey, was stabbed in the left hand, left arm, left shoulder, stomach and back in the top left shower area by another inmate, armed with a metal street knife. The stabbing was not seen by a correctional officer. The unit was

understaffed at the time of the incident. One officer had gone to lunch and her place had not been filled by a relief officer.

46. On September 5, 2014, Theodore Riley was on the upper right tier near the shower in the Southwest 1 housing unit at DC Jail, 1901 D Street, SE, Washington, DC 20003, when another three inmates, attacked and stabbed him with metal shanks. Mr. Riley was stabbed four times in the head, three times in the face, and seven times on his arms neck and back. Mr. Riley had to be transported to Washington Hospital Center for treatment of his injuries. Mr. Riley needed surgery to address his injuries.

47. On October 19, 2017, Mr. Marcus Hunter, an inmate at DC Jail, was attacked by another inmate with a prison knife and was forced to perform oral sex on that inmate. He was inside his cell, Unit SMU-A-1-Cell 6, when the assailant was able to gain access because the cell door had been left unlocked by Correctional Officers.

48. On April 27, 2018, Earl Barnes, was assaulted in D.C. Jail, Southwest 1, moments after he had arrived on the unit following his transfer from protective custody. He was attacked by multiple assailants with metal knives and stabbed approximately 25 times in the head, face, arms, hand, legs and back. He was taken to Medstar, Washington Hospital Center where he was treated for his injuries. He had previously been removed from the same unit because of concerns for his personal safety, but about a month later he was transferred back onto the same unit despite his protestations that it was unsafe to do so.

49. These incidents are only the ones known personally to undersigned counsel. Upon information and belief, the above incidents make up a fraction of the actual number of serious and armed assaults at D.C. Jail during this period.

# COUNT ONE
## Violation of the Due Process Clause of the
## Fifth Amendment to the Constitution
### (against the District and Correctional Unknown Officers)

50. Plaintiff hereby incorporates the preceding paragraphs by reference.

51. Plaintiff had a right under the Fifth Amendment to the U.S. Constitution not to be subjected to pretrial detention that amounts to punishment. Among other things, under the Fifth Amendment, jail officials must take reasonable measures to guarantee the safety of the residents.

52. Defendants John Does, acting under color of law, deprived Mr. Bah of his basic human need for safety by causing him to suffer serious, immediate, and proximate physical and emotional harm.

53. The District of Columbia, despite adequate warning, as a custom and de facto policy failed to train its correctional officers concerning contraband control; and failed to supervise them adequately; and failed to staff housing units with an adequate level of staffing so as to ensure a reasonable level of inmate supervision. These deficiencies proximately caused Mr. Bah serious, immediate physical and emotional harm.

54. Whatever training and supervision existed, it was not implemented by the Doe Defendants on the unit where Mr. Bah lived.

WHEREFORE, plaintiff prays for a judgment against Defendant District of Columbia awarding compensatory damages in the amount of $1,000,000.00 (One Million Dollars), costs of this suit, attorneys' fees, and any other relief deemed appropriate by the court.

# COUNT TWO

## Negligence—Contraband Control

### (against the District and Correctional Unknown Officers)

55. Plaintiff hereby incorporates the preceding paragraphs by reference.

56. Defendant, District of Columbia knew or should have known that, because of its lack of security measures at DC Jail, including, but not limited to:

   a. its failure to control high levels of contraband;

   b. its failure to issue clear policies concerning contraband control;

   c. its failure to perform an adequate entrance procedures; and

   d. its failure to have adequate surveillance protocols

it was reasonably foreseeable that residents, including plaintiff would be attacked by other residents with prohibited weapons.

57. These conditions violated the national standard of care for facilities such as DC Jail as established by the American Correctional Association and by widely accepted industry practices in comparable facilities throughout the United States.

58. Defendant Doe officers further failed to implement what policies and procedures did exist.

59. As a direct and proximate result of the above-described negligence, plaintiff was stabbed in the eye with a metal knife. He suffered and continues to suffer from severe physical problems and mental distress, anxiety, lack of sleep and flashbacks as a result of this incident.

WHEREFORE, plaintiff prays for a judgment against Defendant District of Columbia awarding compensatory damages in the amount of $1,000,000.00 (One Million Dollars), costs of this suit, and any other relief deemed appropriate by the court.

**COUNT THREE**

**Negligence—Supervision of Inmates**

**(against the District and Correctional Unknown Officers)**

60. Plaintiff hereby incorporates the preceding paragraphs by reference.

61. Defendant District of Columbia knew or should have known that, because of its lack of security measures at DC Jail including, but not limited to:

    e. its failure to monitor and supervise properly resident activity and movement;

    f. its failure to secure inmates inside their cells; and

    g. its failure to staff housing units with the required number of officers,

62. Defendant Doe officers further failed to implement what policies and procedures did exist.

63. It was reasonably foreseeable that residents, including plaintiff would be attacked by other residents with prohibited weapons.

64. These conditions violated the national standard of care for facilities such as DC Jail as established by the American Correctional Association and by widely accepted industry practices in comparable facilities throughout the United States.

65. As a direct and proximate result of the above-described negligence, plaintiff was stabbed multiple times with metal knives. He suffered and continues to suffer from severe

physical problems and mental distress, anxiety, lack of sleep and flashbacks as a result of this incident.

WHEREFORE, plaintiff prays for a judgment against Defendant District of Columbia awarding compensatory damages in the amount of $1,000,000.00 (One Million Dollars), costs of this suit, and any other relief deemed appropriate by the court.

## COUNT FOUR

### Negligent Supervision and Training

### (against the District)

66. Plaintiff hereby incorporates the preceding paragraphs, supra, by reference.

67. At the time of plaintiff's injuries, DC Jail was staffed by officers who were inadequately supervised and trained with respect the number and type of contraband searches that should be conducted; the sources of contraband weapons; and manner of their distribution and concealment; the necessary reporting requirements for contraband searches; the proper and required level of supervision for inmate movement; and the correct procedure for securing inmates in their cells and safe housing practices.

68. The District was well informed from previous incidents of violence, the Office of Inspector General audit, and the actions of the United States Marshals Service that there were serious lapses of security. Yet these lapses were not addressed.

69. Upon information and belief, there were frequent instances in which internal policies of DC Jail were ignored by correctional officers and were not corrected by supervisors.

70. Because the correctional officers were inadequately supervised and trained, they failed to monitor, supervise, and secure the area where plaintiff was attacked so as to prevent the attack upon plaintiff. Correctional staff and failed to control excessive levels of contraband weapons among inmates at DC Jail.

71. Such training and supervision violated the national standard of care for facilities such as D.C. Jail as established by the American Correctional Association and by widely accepted industry practices in comparable facilities throughout the United States.

72. As a direct and proximate result of the above-described negligence, plaintiff was repeatedly stabbed as described above. He suffered and continues to suffer from severe physical problems and mental distress, anxiety, lack of sleep and flashbacks as a result of this incident.

WHEREFORE, plaintiff prays for a judgment against defendant District of Columbia awarding compensatory damages in the amount of $1,000,000.00 (One Million Dollars), costs of this suit, and any other relief deemed appropriate by the court.

Respectfully Submitted by,

DEBORAH M. GOLDEN

/s/ *Deborah M. Golden*
Deborah M. Golden
D.C. Bar No. 470578
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
Phone (202) 630-0332

Email: dgolden@debgoldenlaw.com

Geoffrey D. Allen
D.C. Bar No. 288142
1032 15th Street, NW
Suite 298
Washington, DC 20005
Phone: (202) 778-1167
Fax: (202) 898-2571
Email: GeoffreyAllen@verizon.net

**JURY DEMAND**

Plaintiff demands trial by jury as to all counts herein.

/s/ *Deborah M. Golden*
Deborah M. Golden